ROLAND JOHNSON

        Plaintiff,

v.                                    Case No.:  09-C-248

MANITOWOC COUNTY, CALUMET COUNTY,
JERRY PAGEL, WILLIAM TYSON,
MARK WIEGERT, WENDY BALDWIN AND
JOHN DEDERING

        Defendants.
_____

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
_____

      Manitowoc County, Calumet County, Jerry Pagel, William Tyson, Mark Wiegert, Wendy Baldwin and John Dedering, by their attorneys, Crivello Carlson, s.c., submit the following Brief in support of their Motion for Summary Judgment.

## FACTUAL BACKGROUND

      Roland Johnson filed this lawsuit under 42 U.S.C. § 1983 alleging that from November 2005 through March 2006 the Defendants applied for and received a series of search warrants for his property and during execution of those warrants destroyed or damaged certain real and personal property.  **Amended Complaint ¶ 1, 14, 17, 21, and 23**.  The lawsuit named Calumet and Manitowoc Counties along with Calumet County Sheriff Jerry Pagel and Calumet County Sheriff Deputies William Tyson, Mark Wiegert, Wendy Baldwin and John Dedering.  **Amended Complaint ¶ 5-13**.

      The background of this case begins with the investigation into the disappearance and murder of Teresa Halbach by individuals including Steven Avery, the tenant who rented

Plaintiff's trailer at the time. **Amended Complaint ¶ 18**. Plaintiff owned the trailer and garage at issue in this lawsuit. *Id*. **at ¶ 6**. The Search Warrants and Affidavits for Search Warrants accompanying the affidavits of the individual defendants all show that the investigation focused on the trailer where Avery lived along with the garage and the surrounding land and/or structures around the trailer and garage. **Amended Complaint ¶ 21; Aff. Wiegert ¶ 3; Aff. Dedering ¶ 3; Aff. Baldwin ¶ 3; Aff. Tyson ¶ 3; Aff. Pagel ¶ 3**. Johnson is not making any claim that the search warrants in this case were invalid. **Johnson Dep. p. 21**. Nor is he making any claim that his property could not be searched. **Johnson Dep. p. 21**. Johnson is not disputing that the search warrants were based on probable cause. **Johnson Dep. p. 21**.

Those search warrants commanded the individual defendants to seize the specific items identified in Johnson's Initial Disclosures. **See Docket No. 17 at p. 4-5** (Plaintiff's Initial Disclosures) (items with an "x"). Every item that Johnson alleges the officers seized correlate to specific search warrants; indeed, Johnson acknowledges that everything was done pursuant to the search warrants. **Johnson Dep. p. 72, 90**. **See also Aff. Wiegert ¶ 5; Aff. Dedering ¶ 4; Aff. Baldwin ¶ 5; Aff. Tyson ¶ 5; Aff. Pagel ¶ 5**. For example, the Search Warrant dated March 1, 2006, commanded the officers to search and return knives, bullet fragments, human blood and other genetic material, cleaning supplies, bedding, mattresses, "or any other items upon which blood may have sprayed, dripped or otherwise adhered to including, but not limited to, the concrete floor...." **Aff. Baldwin, Exh. 14**. Other Search Warrants were even more expansive: ranging from instrumentalities "capable of taking human life" to objects used to "wrap or encase a body" or to hide or distribute a human body to "[a]ny other items which officers identify has being related to the investigation of the disappearance or homicide of Teresa M. Halbach...." **Aff. Pagel, Exh. 6**.

Johnson is not disputing that the search warrants called for law enforcement officers to seize items and that other search warrants called for law enforcement officers to collect biological samples such as blood. **Johnson Dep. p. 22-23**. He does not contest the search warrants called for law enforcement officers to obtain possible biological substances that may have been in the garage floor. **Johnson Dep. p. 23**. Likewise, he has no objection if some of the search warrants called for the officers to search for blood that may have seeped into the cracks of the concrete floor. **Johnson Dep. p. 23-24**. Of all the items alleged in this case, he agrees that they were all taken subject to the search warrant. **Johnson Dep. p. 27**.

The officers identified several areas of the garage floor where they intended to conduct their search and put circles around those areas. **Johnson Dep. p. 49**. Johnson agrees that the officers were looking for blood under the concrete floor. **Johnson Dep. p. 32-33**. The blood had seeped through cracks. **Aff. Baldwin ¶ 6**. He does not know whether the search warrant told officers with particularity where in the garage to search for such biological samples. **Johnson Dep. p. 33**. He proposes that the officers could have taken a carbide or diamond saw to "saw out the patch that they took" but he does not know what equipment they had access to. **Johnson Dep. p. 33-34**. They did not have access to such equipment and the jack-hammer served as the most reasonable alternative to access the biological evidence. **Aff. Baldwin ¶ 6**. In any event, he admits that "they didn't take the whole thing" and that "[m]ost of it's still there." **Johnson Dep. p. 33**. Indeed, the photographs he produced in discovery show only portions of the concrete floor were removed. **See Aff. Bitar, Exh. 17** (Response to Requests for Production of Documents - color photographs); **see also Aff. Baldwin ¶ 6** (explaining that officers selected only certain areas). Other than using a carbide or diamond saw, Johnson cannot think of any other way in which the officers could have gained access to the concrete floor or the substances

underneath it. **Johnson Dep. p. 34**. "If you wanted that patch of concrete you got to either saw it out or use the jackhammer." **Johnson Dep. p. 34; see also Aff. Baldwin ¶ 6** (explaining that the jack-hammer provided the only means by which the investigators could gain physical access to potential evidence that seeped under the concrete and that use of shovels or hand tools, for instance, may not have allowed for such access or would have delayed the investigation).

Johnson does not have any particular criticisms of the Sheriff or of any of the officers. **Johnson Dep. p. 26**. As far as he knows, the officers acted appropriately in carrying out the search warrants. **Johnson Dep. p. 26**. Johnson is not "going to come into court and criticize those officers as saying that they did something outrageous out there." **Johnson Dep. p. 26.**

The lawsuit names only the officers that Johnson has been able to indentify through the limited number of search warrants that he has collected. **Johnson Dep. p. 24-25**. He has "no idea" as to the number of search warrants in this case. **_Id._ at Johnson Dep. p. 21**. He was not present at any time during any of the searches. **Johnson Dep. p. 24**. Johnson recognizes that it is possible that other law enforcement officers such as those from the State may have been involved in the search. **Johnson Dep. p. 25**. In fact, officers from the Wisconsin Department of Criminal Investigation (DCI) were involved throughout most of the search and return of items. **Aff. Wiegert ¶ 5; Aff. Dedering ¶ 4; Aff. Baldwin ¶ 5; Aff. Tyson ¶ 5; Aff. Pagel ¶ 5**.

Johnson agrees that the criminal proceedings against Mr. Avery and Mr. Dassey are ongoing and that there are appeals and even a motion for a new trial which was filed in September 2009. **Johnson Dep. p. 27; see also Aff. Bitar, Exh. 18**. He recognizes that it is possible that Steven Avery could get a new trial. **Johnson Dep. p. 27**. If there was a new trial, the District Attorney may rely upon some of the same evidence. **Johnson Dep. p. 27**. It is also possible that the District Attorney would want to use different evidence collected from the

property but which may have been excluded during the first trial. **Johnson Dep. p. 28**. Johnson understands that some of the items taken from his property could be used again as evidence of the crimes that may have been committed by Avery or Dassey. **Johnson Dep. p. 28**.

The investigation finished in March 2006. **Johnson Dep. p. 70**. However, Johnson believes that he may have been told as early as February 2006 that he could return to the property. **Johnson Dep. p. 71**.

Johnson claims that persons cannot live in the trailer because the furnishing are gone and because of some of the property damage. **Johnson Dep. p. 31**. The only damage done to the structure was to the main door. **Johnson Dep. p. 97**. However, when asked if there was anything that prevented him from putting new furniture in the trailer or making repairs, Johnson answered "lack of money." **Johnson Dep. p. 31**. He can also use the property for recreational activities like hiking or walking or for purposes of storage (such as for his boat and other "stuff"). **Johnson Dep. p. 30-31**.

Johnson claims that some items, like the chair, are no longer functional, but he admits that it is also possible it was broken while Steven Avery was living there, not during the search. **Johnson Dep. p. 42**. With regard to allege damage to walls inside the trailer, the officers removed two or three sections of paneling from the bedroom. **Johnson Dep. p. 44-45**. He acknowledges that the officers did not touch any of the paneling in the remaining areas of the trailer. **Johnson Dep. p. 45**. With regard to the officers' removal of personal items in the garage so that they could inspect the garage floor, he acknowledges that the officers put all of those items "in a halfway reasonable order that you could find something." **Johnson Dep. p. 47**.

With regard to the carpeting, the officers removed about half of the hallway carpeting and the carpeting in the bedroom. **Johnson Dep. p. 50**. The only damage Johnson is alleging in the

hallway is the removal of a portion of the carpeting. **Johnson Dep. p. 51**. Johnson understood that some of the carpeting had spotting that pre-existed the officers' search in this case. **Johnson Dep. p. 54**.

With regard to the living room, Johnson acknowledges that no paneling or carpeting was damaged or destroyed. **Johnson Dep. p. 52**. His complaint is that the officers took "swatches" from the couch. **Johnson Dep. p. 52**. Yet, he acknowledges that the officers did not cut "swatches all over the place," but focused only on a few areas. **Johnson Dep. p. 75**. Indeed, the photographs he produced in discovery show the officers took great care in selecting the swatches. **See Aff. Bitar, Exh. 17** (Response to Requests for Production of Documents - color photographs).

The collected items are in the possession of the Manitowoc County Clerk of Courts if they were produced in evidence and remaining items are in the possession of the Calumet County Sheriff's Department. **Aff. Wiegert ¶ 9; Aff. Dedering ¶ 7; Aff. Baldwin ¶ 8; Aff. Tyson ¶ 7; Aff. Pagel ¶ 7**. Seized items may be returned upon authorization of the District Attorney that the evidence is no longer needed and that it may be released, but in this case these defendants received no such direction from the District Attorney. *Id*.

About two years ago, Johnson called the Calumet County Sheriff's Department and spoke with the Sheriff's secretary because "I wanted to know who was responsible for damages and what I do go get my property back." **Johnson Dep. p. 6**. Johnson also approached Deputy Weigert and requested a list of items that were taken from his property. **Johnson Dep. p. 38-39**. Johnson has also stopped paying his property taxes "as a form of objection." **Johnson Dep. p. 12**.

The Amended Complaint raises Federal and State law causes of action. For the Federal claims, the Amended Complaint states that the Defendants violated the Fourth, Fifth and Fourteen Amendments to the United States Constitution by the taking of Plaintiff's items and damaging the residence. **Amended Complaint ¶ 28**. For the State causes of action, Johnson alleges a negligence claim and a takings claim under Article I, Sec. 13 of the Wisconsin Constitution. **Amended Complaint ¶ 31-32**. Johnson maintains that he has filed Notice of Injury and Notice of Claims pursuant to Wis. Stats. § 893.80 with both Calumet and Manitowoc Counties. **Amended Complaint ¶ 33**. He further states that Wis. Stats. § 968.20 "provides for a hearing at which return of items seized pursuant to a search warrant may be requested, and that this Court has jurisdiction to conduct such a hearing." **Amended Complaint ¶ 34**.

Johnson has not named any liability expert but merely relies on a building/construction professional who offered an estimate for repairs. **See Docket No. 22** (Plaintiff's Designation of Expert Witnesses).

### STANDARD OF REVIEW

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, establish that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. **Fed. R. Civ. P. 56**. The initial burden is on the moving party to demonstrate, with or without supporting affidavits, the absence of a genuine issue of material fact and that judgment as a matter of law should be granted to the movant. *Celotex Corp. v. Catrett*, **477 U.S. 317, 322 (1986)**. A material fact is one that is outcome determinative of an issue in the case with substantive law identifying which facts are material. *Anderson v. Liberty Lobby, Inc.*, **477 U.S. 242, 248 (1986)**. Once the moving party has met this initial burden, the opposing party must go beyond

the pleadings and designate the specific facts showing that there is a genuine issue for trial. **Anderson, 477 U.S. at 248**. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. **Id. 242**. Nor will speculation, hearsay or conclusory allegations suffice to defeat summary judgment. **See Stagman v. Ryan, 176 F.3d 986, 995 (7th Cir. 1999)**.

## ARGUMENT

I. **ABSTENTION AND PRINCIPLES OF COMITY DEPRIVE THIS COURT OF SUBJECT MATTER JURISDICTION TO THE EXTENT IT INTERFERES WITH ONGOING CRIMINAL PROCEEDINGS.**

To the extent that Johnson asks this Court to issue a decision contrary to the circuit court which authorized the removal of certain property as evidence, in the midst of on-going criminal proceedings against Avery and Dassey in which the property continues to have evidentiary value, **see Johnson Dep. p. 27-28; Aff. Bitar, Exh. 18; Amended Complaint ¶ 34 & Prayer for Relief ¶ 3**, abstention and comity principles limit this Court's jurisdiction.

Generally, a federal court's issuance of a directive to a state court would be an affront to basic principles of comity. **See Michigan v. Long, 463 U.S. 1032, 1040 (1983)**. In **Younger v. Harris, 401 U.S. 37, 43 (1971)**, the Supreme Court noted the "long-standing public policy against federal court interference with state court proceedings".

**Younger** instructs that federal courts should not enjoin pending state criminal prosecutions. Abstention under **Younger** rests primarily on "comity," which involves "a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." **Id. at 44**. The Supreme Court has extended the reach of **Younger** to certain

types of noncriminal judicial proceedings as well.  See *New Orleans Public Service, Inc. v. Council of New Orleans, (NOPSI )* **491 U.S. 350, 367-368 (1989)**.

Similarly, abstention may also be appropriate under the principles set out in *Colorado River Water Conservation District v. United States,* **424 U.S. 800 (1976)**.  In that case, the Supreme Court held that in situations involving concurrent proceedings, dismissal of a federal suit may be appropriate depending upon a number of considerations:

> It has been held, for example, that the court first assuming jurisdiction over property may exercise that jurisdiction to the exclusion of other courts. . . . In assessing the appropriateness of dismissal in the event of an exercise of concurrent jurisdiction, a federal court may also consider such factors as the inconvenience of the federal forum; the desirability of avoiding piecemeal litigation; and the order in which jurisdiction was obtained by the concurrent forums. No one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counselling against that exercise is required. Only the clearest of justifications will warrant dismissal.

*Id.* **at 818-819**.

Although abstention is a narrow limitation to federal court jurisdiction, to the extent Johnson seeks to have this Court undermine the decisions of the circuit court which directed the removal of certain items, in order to obtain return of items which either have been or may be used in the on-going criminal proceedings against Avery and Dassey, such relief brings into question the propriety of exercising federal subject matter jurisdiction.  Johnson cannot ask this Court to exercise jurisdiction over the disposition of evidence in the control of the Wisconsin circuit court that have jurisdiction over the criminal proceedings against Avery and Dassey. Indeed, Johnson's claim places the defendants in the position of honoring the subpoenas issued by a Wisconsin circuit court or to be liable in a federal district court for doing so.  Nothing in the Constitution authorizes such a Hobson's choice.

9

## II. THIS COURT SHOULD GRANT SUMMARY JUDGMENT ON CLAIMS FOR MUNICIPAL LIABILITY.

As to Manitowoc and Calumet Counties, summary judgment is warranted because Johnson has not alleged and cannot establish an unconstitutional policy, practice or custom. Under *Monell v. Dep't of Soc. Serv.*, **436 U.S. 658 (1978),** municipal liability under § 1983 exists only "when execution of a government's policy or custom, whether made by its law-makers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id***. at 694**. A plaintiff seeking to find a municipality liable must establish a causal nexus between his injury and the municipality's alleged "policy or custom." *Id***. at 693-94**. The complaint must allege that an official policy or custom not only caused the constitutional violation, but was "the moving force" behind it. **See** *City of Canton v. Harris*, **489 U.S. 378, 389 (1989)**. The "official policy" requirement for liability under § 1983 is to "distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, **475 U.S. 469, 479 (1986)**. A plaintiff may demonstrate an official policy through: (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Lewis v. City of Chicago*, **496 F.3d 645, 656 (7th Cir. 2007)**.

Here, Plaintiff cannot establish a viable claim under *Monell*. Plaintiff has not shown that the alleged conduct resulted from an unlawful policy or practice or custom. Nor does Johnson show a custom of constitutional abuses beyond the incident alleged in this case. Johnson has not presented evidence of anyone else whose constitutional rights have been abused, such that no reasonable inference can be drawn that the Counties followed a practice of routinely conducting

infirm crime investigations. Nor has Plaintiff shown that the alleged offensive conduct was caused by a person with final policymaking authority.

Moreover, the municipalities were only sued because they were alleged to be responsible for the officers' conduct. If the officers committed no constitutional deprivation, the municipalities cannot be liable. **See *Pepper v. Village of Oak Park*, 430 F.3d 805, 812 (7th Cir. 2005)**.

### III. SUMMARY JUDGMENT SHOULD BE GRANTED WITH RESPECT TO THE CLAIMS AGAINST SHERIFF PAGEL.

Johnson cannot show that a basis for liability exists against Sheriff Pagel. The official capacity claims against Sheriff Pagel are redundant to the municipal claims. The claims against the Sheriff are "'merely another way of asserting a claim against the municipality.'" ***Lanigan v. Village of East Hazel Crest, Ill., 110 F.3d 467, 479 n. 5 (7th Cir. 1997)***.

Moreover, basing a claim of supervisory liability merely on a supervisor's right to control employees is insufficient under ***Monell***. Rather, "§ 1983 creates a cause of action based upon personal liability and predicated upon fault. An individual cannot be held liable in a § 1983 action unless he caused or participated in [the] alleged constitutional deprivation." ***Galdikas v. Fagan, 342 F.3d 684, 693 (7th Cir. 2003)***. Proof that a supervisor was negligent or even grossly negligent in failing to detect or prevent constitutional violations is insufficient: "The supervisor must know about the conduct and facilitate it, condone it, or turn a blind eye for fear of what they might see. They must act either knowingly or with deliberate, reckless indifference." ***Jones v. City of Chicago*, 856 F.2d 985, 991 (7th Cir. 1988)**. Johnson cannot satisfy this standard.

### IV. THE CLAIMS AGAINST INDIVIDUAL OFFICERS FAIL AS A MATTER OF LAW.

#### A. <u>Johnson Cannot Satisfy the Element of Personal Involvement.</u>

11

"[I]ndividual liability under 42 U.S.C. § 1983 can only be based on a finding that the defendant caused the deprivation at issue." *Kelly v. Mun. Courts of Marion County*, **97 F.3d 902, 909 (7th Cir. 1996)**. **See, e.g.,** *Palmer v. Marion County*, **327 F.3d 588, 594 (7th Cir. 2003)** (noting personal involvement requirement for § 1983 suits against individuals). Johnson cannot identify which individual defendant was involved in each alleged offense. Because only persons who cause or participate in the violations are responsible under § 1983, Johnson cannot satisfy the personal involvement standard by simply lumping all these individual defendants together will all alleged damages and seeking to hold them collectively responsible. For example, Deputy Baldwin may have participated in the collection of garage concrete floor samples, **Aff. Baldwin ¶** 6, although it is not alleged nor shown that she selected the areas and performed the jack-hammering. Nor is it alleged or shown that she had any involvement in the other aspects of the investigation other than on March 3, 2006. **See Aff. Baldwin Exh. 15**. Johnson compounds the lack of clarity in this case by ignoring non-parties who may have been involved, particularly State law enforcement officials who were heavily involved in the homicide investigation. **Aff. Wiegert ¶ 5; Aff. Dedering ¶ 4; Aff. Baldwin ¶ 5; Aff. Tyson ¶ 5; Aff. Pagel ¶ 5**.

Regardless, even if Johnson shows to the satisfaction of this Court sufficient personal involvement of these individual defendants, his claims under the Fourth, Fifth and Fourteenth Amendment all fail.

### B.     Absolute and Qualified Immunities Protect the Individiual Defendants

Absolute judicial immunity protects the individual defendants for their actions in carrying out the search warrants. "When functions that are more administrative in character have been undertaken pursuant to the explicit direction of a judicial officer, we have held that that officer's

immunity is also available to the subordinate." ***Kincaid v. Vail*, 969 F.2d 594, 601 (7th Cir. 1992)**. "The policy justifying an extension of absolute immunity in these circumstances is to prevent court personnel and other officials from becoming a lightning rod for harassing litigation aimed at the court." ***Richman v. Sheahan*, 270 F.3d 430, 435 (7th Cir. 2001)**. Although there is no bright-line rule, courts in this circuit have recognized absolute immunity for law enforcement officials when the challenged conduct was specifically ordered by the judge. **See *Henry v. Farmer City State Bank*, 808 F.2d 1228, 1238-1239 (7th Cir. 1986)**. In *Henry*, where the court found quasi-judicial absolute immunity, the § 1983 claim against the sheriff alleged that he wrongfully entered the plaintiffs' home, seized their non-exempt personal property and later sold that property at a public auction, all pursuant to a circuit court order directing the sheriff to enforce a judgment by confession. ***Id*. at 1238**. The claims also alleged that other law enforcement officers confiscated their property as part of this process. ***Id*. at 1239**. Here, too, Johnson acknowledges that the officers acted pursuant to valid search warrants issued by the court and that everything was done pursuant to the search warrants. **Johnson Dep. p. 72, 90**.

Additionally, qualified immunity protects the officers. The Supreme Court has recognized that qualified immunity "'provides ample support' to all but the plainly incompetent or those who knowingly violate the law," protecting officers from violations of constitutional magnitude. ***Burns v. Reed*, 500 U.S. 478, 494-95 (1991)**. Qualified immunity analysis first considers whether plaintiff has shown a constitutional violation. ***Saucier v. Katz*, 533 U.S. 194, 201 (2001)**. If the court finds a constitutional violation has been demonstrated, it must then consider whether the violation involved clearly established constitutional rights of which a reasonable person would have known. ***Id***.

For the reasons below, Johnson cannot show a constitutional violation. Moreover, Johnson cannot establish a violation of "clearly established" law. The officers acted pursuant to, and within the scope of, valid warrants. They are not personally holding any items. Johnson cannot point to analogous case law that put these officers on notice that their conduct offended the Constitution.

C.     **Fourth Amendmnt Claims Against Individual Officers**

Under the Fourth Amendment, the decision on how to execute a warrant is generally left to the discretion of the police so long as it is reasonable. ***Dalia v. United States***, **441 U.S. 238, 257 (1979)**. The test is whether "the officers executing the warrant employed a methodology that is, in light of the values protected by the Fourth Amendment and the exigencies of the situation, a reasonable one." ***United States v. Jones***, **54 F.3d 1285, 1292 (7th Cir. 1995)**. Damage to property may be unavoidable in the execution of a search warrant. ***Dalia v. United States***, **441 U.S. 238, 258 (1979)**. In ***Dalia***, the Supreme Court found that "police officers, when executing a search warrant, must damage property in order to perform their duty." In support of this statement, the Court cited a number of cases involving defendant-officers breaking down an outer door to enable them to execute the warrant after notice of their authority and purpose. ***Dalia***, **441 U.S. at 258**. "Nothing in the language of the Constitution or in this Court's decisions interpreting that language suggests that . . . search warrants . . . must include a specification of the precise manner in which they are to be executed." ***Id***. **at 257-258**. "It is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant." ***Id***. **See also *Tarpley v. Greene*, 684 F.2d 1, 9 (D.C.Cir. 1982)** (destruction of property is not, in and of itself, evidence of unreasonableness or

of Fourth Amendment violation, but destruction of property that is not reasonably necessary to execute a search warrant effectively may violate the Fourth Amendment).

Cases like *United States v. Becker,* **929 F.2d 442 (9th Cir. 1991)** are instructive here. In that case, agents from state and federal investigatory agencies executed a search warrant by, among other things, jackhammering and removing portions of the concrete slab adjacent to Becker's residence. The court in that case concluded that the manner of the search did not render it unreasonable in violation of the Fourth Amendment. The court reasoned that the "agents had ample reason to believe that the concrete slab was being utilized to hide the very evidence that they were legally on the premises to find. The only way to obtain this evidence was to use a jack hammer to break up the concrete." *Id.* **at 447**.

Here, the deputies conducted the search reasonably, professionally and in an orderly manner. Johnson is not claiming that the officers acted purposely or intentionally to damage his property nor in a gross or reckless manner. **Johnson Dep. p. 90**. The officers believe they conducted themselves professionally at all times and reasonably executed the search. **Aff. Wiegert ¶ 8; Aff. Dedering ¶ 6; Aff. Baldwin ¶ 7; Aff. Tyson ¶ 6; Aff. Pagel ¶ 6**. There is no evidence that the officers unnecessarily damaged the property. Nor is there any evidence that the officers exceeded their authority. The photos produced in discovery show that the officers conducted the search with reasonable care and returned only the sought-after items. For example, the officers did not carelessly or needlessly jack-hammer the garage floor. Rather, they had a search warrant indicating that blood may have dripped into the garage concrete floor. **Aff. Baldwin, Exh. 14**. Only select areas if the concrete floor were subjected to the search. The officers had no other reasonable method to access the concrete floor other than using the jack-hammer. As another example, the fact that the deputies took only portions of the trailer's

interior bedroom walls, limited hallway carpeting and swatches from select areas of the sofa confirm that they avoided unnecessary damage. The officers' conduct in each instance was reasonably necessary to carry out the warrant's purpose. Any seizure of items or destruction of property was reasonable under all the circumstances

Further, where, as here, an initial seizure of property was reasonable, the failure to return the items should not, by itself, state a separate Fourth Amendment claim of unreasonable seizure. See *Shaul v. Cherry Valley-Springfield Cent. High Sch. Dist.*, **363 F.3d 177, 187 (2nd Cir. 2004)** (holding claim related to government's retention of property after seizure raised due process rather than unreasonable seizure claim); *Lee v. City of Chicago*, **330 F.3d 456, 461-65 (7th Cir. 2003)** (holding that where property was lawfully seized by government, plaintiff could not bring a Fourth Amendment unreasonable seizure claim to challenge the conditions imposed on the property's return, although other legal remedies for return might be available). "Once an individual has been meaningfully dispossessed, the seizure of the property is complete, and once justified by probable cause, that seizure is reasonable. The [Fourth] amendment then cannot be invoked by the dispossessed owner to regain his property." *Lee*, **330 F.3d at 465**.

Finally, the fact that criminal proceedings continue against Avery and Dassey weighs in favor of dismissal of the Fourth Amendment claim in this case. As a general rule, property seized by police in the execution of a search warrant should be returned to the rightful owner *once the criminal proceedings have terminated*. **See 68 Am. Jur.2d** *Searches and Seizures* **§ 301;** *Boggs v. Merletti*, **987 F.Supp. 1 (D.D.C. 1997)**. Once the court's need for the evidence terminates, the Court has a duty to return it. *Id*. The government may retain evidence even after the completion of the trial if it has a continuing interest in the property beyond its use in the criminal proceedings. **See** *United States v. Martinson,* **809 F.2d 1364, 1369 (9th Cir. 1987)**.

Even a lengthy delay in returning property is not considered a violation of Fourth Amendment rights. In *U.S. v. Syphers,* **296 F.Supp.2d 50 (D.N.H. 2003)**, the court held that the state had not violated defendant's Fourth Amendment rights by seizing the defendant's personal computer, pursuant to a search warrant, for seven months in order to inspect it for child pornography. The lengthy delay was reasonable given the state was facing a overwhelming backlog in the investigation of computer crimes.

Finally, Wisconsin Courts have held that claims involving lengthy deprivation of property constituting evidence must be brought under state law, because meaningful post deprivation remedies exists under Wis. Stats. § 968.20. **See *Lofftin v. Madison Police Dept.,* 2003 WL 23315791 (W. D. WI 2003)**. Where meaningful legal means exist under the State law there can be no constitutional due process violation. Johnson offers no reason why such legal means are insufficient. Nor can he establish any legal grounds why this Court should provide such a hearing.

### D.    Fifth Amendment Claim Against Individual Officers

Johnson says that his claims "most closely fit[]" under the Fifth Amendment's "takings" clause. **Aff. Bitar, Exh. 17, Response to Interrogatory No. 13**. The Fifth Amendment provides: "[N]or shall private property be taken for public use, without just compensation."

The Fifth Amendment is not implicated under these facts. Johnson's property was seized and/or damaged allegedly as a consequence of violations of law by Avery and Dassey. The officers acted pursuant to the police power, not the power of eminent domain. "The government may not be required to compensate an owner for property which it has already lawfully acquired under the exercise of governmental authority other than the power of eminent domain." ***Bennis v. Michigan*, 516 U.S. 442, 452-453 (1996)**. In ***National Board of Y. M. C. A. v. United States*,**

**395 U.S. 85 (1969)**, the Supreme Court held that the plaintiff was not entitled to recover under the Takings Clause for damage done to one of its buildings which had been occupied by United States troops during a riot, because the troops were acting primarily in defense of the building, as opposed to primarily for the public good. The Court held that where a "private party is the particular intended beneficiary of the governmental activity, 'fairness and justice' do not require that losses which may result from that activity 'be borne by the public as a whole,' even though the activity may also be intended incidentally to benefit the public...." *YMCA,* **395 U.S. at 92**.

As the Supreme Court has noted, "orders temporarily prohibiting access to crime scenes, businesses that violate health codes, fire-damaged buildings, or other areas that we cannot now foresee ... have long been considered permissible exercises of the police power" which do not entitle the individuals affected to compensation. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* **535 U.S. 302 (2002)**. Damage or destruction that occurs as an unintended, incidental consequence of lawful activity by government actors does not constitute a compensable taking. See *Armstrong v. United States*, **364 U.S. 40 (1960)** (distinguishing compensable takings actions from noncompensable incidental or consequential damage); *United States v. Cent. Eureka Mining Co.*, **357 U.S. 155, 169 (1958)** (federal government not obligated to pay just compensation to mine operators because a war-time limitation order, which ordered the cessation of gold mine operations, was not a taking under the constitution). **See also** *Hurtado v. United States,* **410 U.S. 578, 588-589 (1973)** ("public duties" such as the giving of testimony do not trigger just compensation requirements; "It is beyond dispute that there is in fact a public obligation to provide evidence, … and that this obligation persists no matter how

financially burdensome it may be.").  Other courts to have considered the issue have reached the same result.[1]

Moreover, a governmental taking must deprive the property owner of all economically viable use of the property. *Lucas v. South Carolina Coastal Council,* **505 U.S. 1003, 1016 (1992)** (holding that when an owner sacrifices all economically beneficial use of property in the name of common good, he has suffered a taking).  Here, Johnson cannot show that the alleged conduct stripped him of *all* economically viable use of his property.

This case clearly does not involve a regulatory taking or a classic per se taking.  Johnson has not been deprived of his right to own, use or dispose of the property.  At most, this case involves only a temporary physical invasion of private property by the government. *Loretto v. Teleprompter Manhattan CATV Corp.,* **458 U.S. 419, 430 (1982)** (noting "the distinction between a permanent physical occupation, a physical invasion short of an occupation, and a regulation that merely restricts the use of property."). As the *Loretto* Court explained, every physical invasion is not a taking. *Loretto,* **458 U.S. at 436, 102 S.Ct. 3164**. Temporary invasions are subject to a "complex balancing process to determine whether they are a taking ... [because]

---

[1] **See, e.g.,** *Lawmaster v. Ward,* **125 F.3d 1341, 1351 (10th Cir.1997)**(plaintiff who alleged that officers ransacked his home during a search failed to "allege any facts showing how his property was taken for public use in violation of the Fifth Amendment."); *Brutsche v. City of Kent,* **193 P.3d 110 (Wash. 2008)** (the plaintiff brought a "takings" action against the city alleging that law enforcement officers caused property damages when they used a battering ram to enter the premises; the court held that there was no compensable taking under the state constitution for destruction of property or seizure and preservation of evidence by the police when executing a search warrant); *Kelley v. Story County Sheriff,* **611 N.W.2d 475 (Iowa 2000)** (collecting cases) (damage to private property caused by officers' forcible entry in order to execute arrest warrant did not result in a "taking" under Iowa's Constitution; officers acted pursuant to the police power when enforcing the criminal laws, not the power of eminent domain); *Certain Interested Underwriters v. City of St. Petersburg,* **864 So.2d 1145 (Fl. App. 2003)** (while executing valid search warrant, police threw "flash-bang" grenades into residence which caused a fire and entire destruction of residence; court held that no compensable taking occurred under either Florida and Federal takings clauses); *Brannon v. City of Tulsa,* **932 P.2d 44 (Okla. App. 1996)** (plaintiffs sued police for real and personal property to their apartments when police caused damages including fire to building while attempting to apprehend two murder suspects; court held that actions were not direct and substantial enough to warrant compensation under the state and federal "takings" clause); *McCoy v. Sanders,* **148 S.E.2d 902 (Ga. App. 1966)** (law enforcement officers who drained plaintiff's pond thereby damaging pond and its fish, during course of homicide investigation, were acting pursuant to the police powers, not the power of eminent domain)

they do not absolutely dispossess the owner of his rights to use, and exclude others from, his property." *Id*. "[R]esolving whether public action works a taking is ordinarily an ad hoc inquiry in which several factors are particularly significant – the economic impact of the regulation, the extent to which it interferes with investment-backed expectations, and the character of the governmental action." ***Id.* at 432** (citing ***Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124 (1978)**).

In this case, the balance weighs in favor of dismissal. <u>First</u>, the economic impact of the government action was minimal. Johnson alleges the personal items amounted to $1,000.00, that the garage requires $14,000.00 in repairs and that the loss of use of the property amounted to $300/month. **See Docket No. 17 (Plaintiff's Initial Disclosures) at p. 3, 17; Aff. Bitar, Exh. 17, Response to Interrogatory No. 1**. Compared to the many cases in which more significant damages were caused without a "takings" violation, the economic impact in this case was minimal. <u>Second</u>, Johnson acknowledges that he did not reasonably have an expectation that the property would remain free of legal searches founded upon probable cause. **Johnson Dep. p. 21**. <u>Third</u>, regarding the "character of the governmental action" prong, a "'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government ... than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." ***Penn Central,* 438 U.S. at 124**. Here, the alleged damages were sustained as a result of an investigative search that was reasonably executed based upon a judicial finding of probable cause to believe that a crime took place in and around the property.

Johnson did not follow Wisconsin state law procedures to remedy any alleged "taking." Although "due process requires that an owner whose property is taken for public use must be

given a hearing in determining just compensation," *Walker v. City of Hutchinson,* **352 U.S. 112, 115 (1956)**, Johnson admittedly has not pursued any Wisconsin state statutory or common law remedies, including Wis. Stat. §§ 968.20, 973.20, or the Crime Victim Compensation Fund under Chapter 949.[2]  Under Wis. Stat. § 968.20, governing the return of seized property, the property owner has the burden of moving for the return of the property.  **See** *Supreme Video, Inc. v. Schulz,* **808 F. Supp. 1380 (1992)**.  Nor has he requested restitution from Avery or Dassey as he would be authorized to do under Wisconsin State law.  *State v. Canady,* **2000 WI App 87, ¶¶ 7-8, 234 Wis.2d 261, 610 N.W.2d 147**.

Lastly, Johnson alleged a "takings" claim under Article I, § 13 of the Wisconsin Constitution.  **See Amended Complaint ¶ 5, 31**.  The Wisconsin Constitution, like its federal counterpart, does not provide compensation simply for *damage* to property.  **See** *Wisconsin Power and Light Company v. Colombia County*, **3 Wis.2d 1, 6, 87N.W.2d 279 (1958)**.  As a result, "mere consequential damage to property resulting from governmental action is not a taking thereof."  *Id*.  Moreover, although a taking may occur short of an actual occupation, it must be shown that the government action "deprives the owner of all, or substantially all, of the beneficial use of his property."  *Howell Plaza Inc. v. State Highway Commission,* **66 Wis.2d 720, 726, 226 N.W.2d 185 (1975)**.  As stated above, Johnson cannot satisfy these requirements where his rights to use or dispose of the property remain intact.

### E.  Fourteenth Amendment Claim Against Individual Officers

---

[2] Johnson has not pursued any avenues under the Crime Victims Fund; he has never even heard of it.  **Johnson Dep. p. 83**.  Nor did he file any request for restitution or any type of application or petition seeking the return of his property.  **Johnson Dep. p. 84-85**.  Nor has he ever approached the District Attorney to see if any of his items could be returned.  **Johnson Dep. p. 85-86**.

Case 1:09-cv-00248-RTR   Filed 01/15/10   Page 21 of 25   Document 30

Johnson states that the Fourteenth Amendment substantive due process protections apply to his interests in having his property safe from governmental seizure or destruction. **Response to Interrogatory No. 13**.

Any claim under the Fourteenth Amendment should be dismissed on the ground that "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." ***United States v. Lanier,*** **520 U.S. 259, 272 (1997);** ***Graham v. Connor,*** **490 U.S. 386, 395 (1989)** ("All claims that law enforcement officers have used excessive force ... in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment").

The Seventh Circuit has emphasized "how limited the scope of the substantive due process doctrine is." ***Dunn v. Fairfield Cmty. High Sch. Dist. No. 225,*** **158 F.3d 962, 965 (7th Cir. 1998)** (citing ***Washington v. Glucksberg,*** **521 U.S. 702 (1997)**). Unless a governmental practice encroaches on a fundamental right, substantive due process requires only that the practice be neither arbitrary nor irrational. **See** ***Glucksberg,*** **521 U.S. at 728**. Here there is no "affirmative abuse of power" needed to sustain such a claim. ***Davidson v. Cannon,*** **474 U. S. 344 (1986)**. Nor is there conduct which "shocks the conscience." ***Armstrong v. Squadrito,*** **152 F.3d 561 (7th Cir. 1998)**. Indeed, the record shows only professionalism and restraint on the part of law enforcement officers following court orders.

## V.    THE STATE LAW CLAIMS FAIL AS A MATTER OF LAW

Johnson also presents a claim under the Wisconsin constitution and makes a claim for negligence against the officers. **Amended Complaint ¶¶ 31-32**. This Court may decline supplemental jurisdiction over these claims pursuant to **28 U.S.C. § 1367(c),** which provides:

> (c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—
>
> (1) the claim raises novel or complex issues of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

"In exercising that discretion, the court should consider a number of factors, including 'the nature of the state law claims at issue, their ease of resolution, and the actual, and avoidable, expenditure of judicial resources....'" ***Timm v. Mead Corp.*, 32 F.3d 273, 277 (7th Cir. 1994)**.

As set forth above, Johnson cannot establish any violations of federal rights or statutes, and thus there is no federal question jurisdiction.

Even if the Court considered the state law claims, they lack merit for several reasons.

The Wisconsin Constitution's takings clause mirrors its federal counterpart making much of the analysis above equally applicable here.[3] The Wisconsin Constitution only compensates takings, not damage. ***Menick v. City of Menasha*, 200 Wis.2d 737, 744, 547 N.W.2d 778 (Ct. App. 1996)**.

Negligence claims are barred by discretionary act immunity under Wis. Stat. § 893.80. Municipal entities, officials and employees are granted immunity by § 893.80(4) for acts done in the exercise of legislative, quasi-legislative, judicial, or quasi-judicial functions. ***Kimps v. Hill*, 200 Wis.2d 1, 10, n.6, 546 N.W.2d 151 (1996)**. There is no liability if the act or omission is based on an "exercise of judgment." ***Willow Creek Ranch, L.L.C. v. Town of Shelby*, 2000 WI 56, 235**

---

[3] The Fifth Amendment states in part: "nor shall private property be taken for public use, without just compensation." The Wisconsin counterpart states: "The property of no person shall be taken for public use without just compensation therefore."

**Wis.2d 409, 611 N.W.2d 693**. Immunity assumes negligence. **See *Ottinger v. Pinel*, 215 Wis.2d 266, 275, 572 N.W.2d 519 (Ct. App. 1997)** ("There is no substantive liability for damages resulting from <u>mistakes</u> in judgment where the officer is specifically empowered to exercise such judgment."); ***Kierstyn v. Racine Unified Sch. Dist.*, 228 Wis.2d 81, 94-95, 596 N.W.2d 417 (1999)** ("Immunity presupposes negligence and has no reason for existence without it.").

A fairly broad range of acts and decisions by municipal employees fall within immunity, including actions of law enforcement officers. **See *Estate of Cavanaugh v. Andrade*, 202 Wis.2d 290, 315, 550 N.W.2d 103 (1996)** (a police officer's 'decision to initiate or continue a high-speed chase'); ***Barillari v. City of Milwaukee*, 194 Wis.2d 247, 260, 533 N.W.2d 759 (1995)** ("how best to utilize law enforcement resources" and "to carry out [law enforcement] responsibilities"). This immunity has been extended to use-of-force claims.[4]

In addition to § 893.80 immunity, the Wisconsin courts have held that a sheriff has absolute immunity when executing judicial orders. "[E]ven when a non-judicial officer performs a ministerial function, but at the direction of a judge who is acting in a judicial capacity, that officer is cloaked with absolute immunity from civil liability." ***Sell v. Thompson & Coates, Ltd.,* 163 Wis.2d 765, 772-773, 472 N.W.2d 834 (Ct. App. 1991)** ("the theory of immunity is that 'it is better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.' …Thus, since the sheriff in this case executed a facially valid arrest order, the county is immune because the sheriff was performing an act 'intimately related to the judicial process.") (quoted sources omitted).

---

[4] ***Sheridan v. City of Janesville*, 164 Wis.2d 420, 428, 474 N.W.2d 799 (Ct. App. 1991)** (the plaintiff claimed that two police officers negligently injured him while performing field sobriety tests, arresting him, and assisting him into the squad car. Court held the officers were immune from liability because their actions were not the type of "absolute" or imperatively prescribed acts which may be described as ministerial, but rather were discretionary in nature.); ***Wilson v. City of Milwaukee*, 138 F.Supp.2d 1126, 1130-1132 (E. D. Wis. 2001)** (rejected several state law causes of action under Wis. Stat. § 893.80 where arrestee claimed physical injuries and economic loss as a result of police officers' carelessness and negligence in arresting him; "decisions about how much force to use in effecting an arrest are quintessentially discretionary.").

Under these authorities, § 893.80 immunity bars this suit challenging these officers' decision-making in executing warrants. The officers' actions in collecting concrete samples from the garage, fabric samples from the sofa, portions of wood paneling that had biological evidence, and the myriad of other decisions they made in the field all fall within discretionary immunity.

**<u>CONCLUSION</u>**

For these reasons, it is respectfully requested that this Court enter judgment in favor of the defendants Manitowoc County, Calumet County, Jerry Pagel, William Tyson, Mark Wiegert, Wendy Baldwin and John Dedering, and dismiss the Plaintiff's claims as against these defendants on their merits and with prejudice.

Dated this 15th day of January, 2010.

> Attorneys for Manitowoc County, Calumet County,
> Jerry Pagel, William Tyson, Mark Wiegert,
> Wendy Baldwin and John Dedering
>
> BY: /s Remzy D. Bitar
> RAYMOND J. POLLEN
> State Bar No.: 1000036
> REMZY D. BITAR
> State Bar No.: 1038340
> Crivello Carlson, S.C.
> 710 North Plankinton Avenue
> Milwaukee, Wisconsin 53203
> 414-271-7722
> Email: rpollen@crivellocarlson.com
>    rbitar@crivellocarlson.com